RUSSELL and wife, Appellants, vs. KING and others, Respondents.

*May 13—June 21, 1926.*

*Fraud: Persons negotiating loan and benefited thereby, but misrepresenting nothing: Attorney advising loan: Liability.*

1. In the absence of conspiracy, one who took no part in negotiations leading up to the lending of money which is claimed to have been fraudulently obtained, and who misrepresented nothing, is not guilty of fraud although he received part of the money loaned in payment of a debt of the borrower. p. 548.

2. The attorney who negotiated the loan is *held*, under the evidence, justified in informing the lender that it would be advisable to make the loan in order to secure the return of certain mortgages held by the borrower, whom the attorney represented, and to avoid a larger loss, and is not guilty of fraud.  p. 550.

3. A real-estate agent is not guilty of fraud in a transaction whereby the purchaser of land on contract made a loan to another in order to secure the return of mortgages and the cancellation of the contract, it not appearing that any false representation was made by the agent.  p. 550.

APPEAL from a judgment of the county court of Columbia county: A. F. KELLOGG, Judge.  *Affirmed.*

This is an appeal from a judgment in favor of the defendants *Jackman, O'Keefe,* and *Hanley.*  The plaintiffs appealed.

This was an action in fraud to recover $3,000 with interest claimed to have been secured by the defendants from the plaintiffs through fraud.  The case was tried before the court and a jury.  The jury rendered a special verdict, generally· favorable to the plaintiffs, which was set aside by the trial court.

*Robert N. Nelson* and *Carl Christianson,* both of Madison, for the appellants.

*H. B. Rogers* of Portage, for the respondents *Jackman* and *O'Keefe.*

*H. E. Andrews* of Portage, for the respondent *Hanley.*

CROWNHART, J.  A very considerable amount of evidence was taken in this case, but the main facts are ·not much in dispute.  They will be briefly summarized.

The defendant *Hanley* was engaged in the real-estate business at Portage for a number of years, and at the times in question was the agent for the W. E. Stewart Land Company.  He had performed some services for the plaintiffs prior to and since the transactions complained of.

The defendant *James Jackman,* at the times herein men-

tioned, was the owner and keeper of a garage at Portage, Columbia county.

The defendant *John O'Keefe* was an attorney at law, living at Portage and engaged in the practice of his profession there for many years.

The defendant *Barton B. King* was an agent of the W. E. Stewart Land Company, a foreign corporation dealing in Texas lands. He was at Portage for a time and had an office with the defendant *Hanley,* but *King* and *Hanley* were not in partnership. The Land Company was not served and it was dropped out of the case.

The plaintiff *Martha Russell* was forty-eight years old, an intelligent woman, possessed of a separate estate of the value of several thousand dollars, which she handled herself. She was the wife of the plaintiff *Henry Russell. Henry Russell,* with his wife, lived on a small farm at Endeavor, the husband owning the farm. Endeavor is about twelve miles from Portage.

It appears that *Henry Russell,* in 1919, went to Texas to view the property of the W. E. Stewart Land Company. He was favorably impressed with the prospects, but after he came back he lost interest in the property. Early in 1920 the defendant *Hanley* suggested to the *Russells* that the Land Company was arranging to take a party to Texas to look over their property, with a view of purchasing, and suggested that they go along. Finally, *Mrs. Russell* arranged to go with the party, and did go. *Hanley* did not go, but *King* went along. While in Texas they viewed certain properties, and *King* urged *Mrs. Russell* to buy a parcel of land. She finally consented and purchased twenty-five acres at $450 an acre, and gave *King* $25 in cash and a check on a Portage bank for $200. She had no money in the bank, but later arranged with *Hanley* to deposit the money to meet the check, which he did. While in Texas she signed her husband's name to a land contract covering the purchase of the property, and to three notes amounting

to $5,200, under the condition, as she says, that if her husband was not satisfied the deal was to be canceled. She came back from Texas and explained the situation to her husband, who was dissatisfied, and declined to go through with the deal.

Early in April a Mr. Erb, from Minneapolis, representing the Land Company, came to Portage, and he, together with *Hanley,* went out to Endeavor to see the *Russells* to urge upon them the carrying out of the contract, with the result that *Mrs. Russell* came in to Portage the next day to the office of *Hanley.* There were present the defendants *King* and *Hanley,* and Erb, besides *Mrs. Russell's* fifteen-year-old boy. *Mrs. Russell* testified that *King, Hanley,* and Erb all urged her to carry out the Texas land contract, and threatened to sue her husband if they did not do so. She claims to have been very much agitated over the possibility of suit against her husband, and finally agreed to give a mortgage for $4,500 on a piece of property she owned in Portage, and to assign a mortgage which she held for $700, to cover the $5,200 in notes. The mortgage and assignment were executed in blank and given to Erb, who in turn turned them over to *Hanley* for safe-keeping, and *Hanley* placed them in his safe. This was on April 9, 1920. *Mrs. Russell* did not have the $700 mortgage with her, but she agreed to deliver the mortgage and an insurance policy with it, which she did on the 14th. She did not consult any attorney before executing the mortgage and assignment or before making delivery of the assigned mortgage and insurance policy on the 14th. The mortgages were to be negotiated by *Hanley* without discount and the proceeds applied to the payment of the notes. *Hanley* made some effort to sell the mortgages but failed. Later, on July 20th, *Mrs. Russell* wrote to *Hanley* to find out what had been done about the sale of the mortgages and the payment of the notes. *Hanley* replied that he did not have

the papers; that they had been taken out of his safe, and that they belonged to the company. It appears that the mortgages and notes had been taken from *Hanley's* safe without his knowledge or consent, and he supposed that they had been sent on to the Land Company, but in fact *King* had taken the mortgages from the safe and had negotiated them as security for his own indebtedness.

*King* was in bad shape financially and was being pressed by his creditors. He went to the *Russells* the next evening after they had received *Hanley's* reply about the papers, and solicited a loan of $2,500 from them upon the promise that he would return to *Mrs. Russell* her notes and mortgages and secure cancellation of the land contract. The *Russells* were anxious to get out from under the land contract, as it involved something over $11,000 and it would take all they had to pay for the land. *King* promised as. security for the loan to assign his interest in a land contract that he had involving Texas land. This visit of *King* to the *Russells* resulted in *Mr. Russell* going to Portage to make inquiries. He went to see *Hanley* and inquired what kind of a mess *King* was in, and *Hanley* told him that he was in bad straits financially. *Russell* told him that *King* wished a loan of $2,500 from *Russell,* and *Hanley* replied that he did not know what *King* had to give for security,— that *King* owed him money and that he would not trust him. *Russell* had arranged to see *King* at the office of Attorney Metzler. Upon calling there he found that Metzler was away and that *King* had left word to meet him at the defendant *O'Keefe's* office. He went to *O'Keefe's* office and found *King* there. All three conferred over the matter in hand, and finally *O'Keefe* and *Hanley* retired to another room and conferred. *O'Keefe,* upon inquiry for advice from *Russell,* told him that he thought *Russell* had better make the loan under the circumstances. *Russell* finally agreed to do so if *O'Keefe* would secure the loan upon a

mortgage of plaintiff's property. The next day *Jackman,* in his automobile, drove *O'Keefe* and *King* out to the *Russells.* At that time *King* wished a loan of $3,000, saying that he could not secure a release of the mortgages of *Mrs. Russell* with less than that amount. Finally, a mortgage and note were made out for $3,000 to the Portage Land & Trust Company, upon which *O'Keefe* secured $3,000 for *King,* but *O'Keefe* used the money to recover the mortgages which *Mrs. Russell* had given in April and a cancellation of the land contract, which he returned to her, and out of the money he also paid *Jackman* $1,200, which *King* owed *Jackman* and which *O'Keefe* had· been trying to collect from *King* as *Jackman's* attorney. Prior to this *Jackman* had got possession of *King's* automobile in payment of his claim, but upon payment of the claim in cash *Jackman* released the automobile to *King.* Prior to this time, however, *Hanley* had been endeavoring to collect a claim against *King* of some $1,800, and had attached *King's* automobile in *Jackman's* garage. Upon a release of *Jackman's* claim against the automobile, *King* gave to *Hanley* a mortgage on the automobile to secure his claim.

When *Russell* visited *O'Keefe* in Portage with *King* and got advice from *O'Keefe,* he offered to pay *O'Keefe,* but *O'Keefe* told him that *King* would pay him for his services, and *O'Keefe* never made any claim against the *Russells* for services.

The foregoing is in substance the claim of the *Russells* in their testimony. The defendants deny some of these statements and explain others. In open court on the trial the plaintiffs waived any charge of conspiracy against the defendants, and made no claim that the Texas lands which the *Russells* purchased were not worth the price they agreed to pay. So the real and only claim is the claim of fraud against the defendants.

It is clear there can be no claim of fraud against *Jackman.* He made no representations to either of the *Russells* of any

kind.   He took no part in the negotiations leading up to
the loaning of the money to *King*.   He misrepresented
nothing.

As to *O'Keefe,* he made no pretense that he was attorney
for the *Russells.   Russell* stated his case to him and asked
his advice, knowing, apparently, *O'Keefe's* relation to *King.
King* had preceded him to *O'Keefe's* office and was in con-
sultation with *O'Keefe* when *Russell* came in.   He retired
from *Russell's* presence to consult with *O'Keefe* while *Rus-
sell* was there.   *O'Keefe* did advise him to make the loan
in order that he might not lose a larger amount and that
he might get the cancellation of the land contract.

*Mr. Russell* testified :

"I thought by doing that [making *King* the loan] we
would save the difference between the $3,000 and $4,500;
he told us we better if we was going to lose anything we
better lose $3,000 than $4,500.   *Mr. O'Keefe* told me that.
I took stock in that."

With reference to employing *O'Keefe, Russell* testified :

"I offered to pay him when he got through, and he said
*Mr. King* would take care of that."

Further, *Mr. Russell* testified with reference to the con-
versation with *O'Keefe* in his office :

"I had never seen *Mr. O'Keefe* before.   We were both
there, I and *Mr. King.   Mr. King* was there when I got
there.   We asked *Mr. O'Keefe* about whether it would be
advisable for me to loan him this money in order to get
back these other notes and mortgages, and *Mr. O'Keefe*
told me that it was the only way we could get them back;
they was in his hands and he could do what he pleased with
them; they were open notes and he could do with them as
he's a mind to, sell them.   The mortgage *Mrs. Russell* held
on the property down here of $700 and the mortgage she
gave on the house and lot she has down here of $4,500.
The notes she signed down in Texas are the ones I wanted
to get back."

It appears, and did appear to *O'Keefe,* that *King* was in

a bad way; that he had negotiated these mortgages as security, and in order to return them he had to pay the debt he owed. Not only would the *Russells* be relieved by the return of their mortgages, but they would also get a cancellation of the land contract, which would release them from the payment of the further sum of over $5,000. We cannot say from this evidence that *O'Keefe* was not fully justified, even if he had been *Russell's* attorney, in giving him that advice. *Russell* understood the situation well enough. It was not a question of getting legal advice. It was a question of business judgment, and *Russell* saw for himself that it was better to lose $3,000 than to lose $5,200 and go on with the Texas land deal, which he could not afford. It seems clear that there is no case against *O'Keefe*.

*Hanley* was an agent of the Land Company, doing business on commission. If the Texas land deal went through, he stood to get a commission of three per cent. on the purchase price. But *Hanley* had nothing to do in getting the *Russells* into the deal other than his suggestion that they go down to Texas to look over the land. It is said that he stood in a fiduciary relation to the *Russells,* but it does not appear that his relation to the *Russells* was at all intimate or that they relied upon him for advice. His only transactions with the *Russells* were in the handling of two or three small real-estate matters. When *Russell* went to see *Hanley* about loaning money to *King,* it was not claimed that *Hanley* lent any encouragement to *Russell* to do so, or made any false representations of any character. The only basis for suspicion against *Hanley* is that because, out of the money loaned to *King, Jackman's* claim on the automobile was released and *Hanley* was able to get security for his claim against *King* on the automobile. It does not appear that any arrangement had been made between *Hanley, Jackman,* and *King* whereby *Hanley* was to be paid anything or any security given him in order to induce the loan. At any rate, there is nothing to show that *Hanley* ever made

any false representation to the *Russells,* and the court was right in dismissing the complaint as to him.

As to the defendant *King,* it is conceded by all that he was a fraud, and clearly he obtained the money from the *Russells* by fraud. He had used the mortgages which were for the benefit of the Land Company for his own purposes, and only secured the loan by promising to return the mortgages. His acts were fraudulent in getting possession of the mortgages in the first place, and fraudulent in negotiating the mortgages. He did not appear at the trial. The trial court entered judgment against him for the amount of the loan with interest on his note. The plaintiffs were entitled to a tort judgment, and if that will be of any comfort to them they should have it.

*By the Court.*—The judgment of the county court is affirmed.